**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CLAY T. ROBERTS and CHARITABLE | ) | |
| ESTATE COUNSELORS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-356-GKF-TLW |
| | ) | |
| AMERICAN MEDICAL SECURITY, | ) | |
| INC., UNITED WISCONSIN LIFE | ) | |
| INSURANCE CO., AMERICAN MEDICAL | ) | |
| SECURITY LIFE INSURANCE CO., | ) | |
| MARTIN DALE, and THE DALE GROUP, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the court is the Motion for Summary Judgment [Dkt. #102] filed by defendants

American Medical Security, Inc. ("AMS"), United Wisconsin Life Insurance Co. ("UWLIC"),

Martin Dale ("Dale) and The Dale Group ("Dale Group").

This is the second of two lawsuits filed by plaintiffs, Clay T. Roberts ("Roberts") and

Charitable Estate Counselors, Inc. ("CEC"), arising out of a 1996 dispute with their former

employee, Michael Stephens ("Stephens"). Plaintiffs filed the first lawsuit, *Charitable Estate*

*Counselors and Clay Roberts v. American Medical Security, Inc., et al.,* Civil Action No. CJ-

1998-5316, in Tulsa County District Court in November 1998, alleging 17 causes of action

against Stephens and defendants herein. Subsequently, plaintiffs settled their entire dispute with

Stephens and the claims against him were dismissed with prejudice on November 20, 2007. The

claims against the remaining defendants were dismissed without prejudice on January 9, 2008.

On November 19, 2008, plaintiffs filed this second action against defendants in Tulsa

County District Court. [Dkt. #2-2]. As set forth in the Petition, this suit involves the same

parties, contracts and allegations as the first lawsuit (minus the claims against Stephens).  [*Id.*].

As in their first suit, plaintiffs originally asserted 17 causes of action.  [*Id.*].  The case was

removed to federal court on June 8, 2009, on the basis of diversity jurisdiction.  [Dkt. #2].  After

removal, plaintiffs stipulated to dismissal of 11 of the claims.  [Dkt. #79].  The remaining six

claims are for:  (1) breach of contract; (2) interference with prospective business advantage; (3)

tortious breach of contract; (4) misappropriation; (5) conversion; and (6) accounting.  Defendants

have moved for summary judgment on all six claims.  Plaintiffs have filed separate responses

opposing the motion.[1]

## I. Material Facts

During the 1990's, AMS marketed and sold medical insurance policies to individuals and

small employers using a sales "hierarchy" approach.  AMS contracted with individuals to

become Regional Sales Managers ("RSM's").  The RSM's were independent contractors who

earned compensation from AMS in the form of overrides from the sale of AMS insurance by

independent insurance agents in their territories.  [Dkt. #102, Ex. 1, Michael Stephens Dep.,

39:14-41:17; Ex. 6, Dec. of Amy Terrien, ¶5].

RSMs, in turn, typically contracted with individuals to become District Sales Managers

("DSMs").  The DSMs' duties were to assist the RSM in recruiting independent agents to market

and sell AMS's products in a particular geographic section of the RSM's territory.  DSMs were

compensated by the RSM, usually in the form of overrides from the sale of AMS insurance

products by the agents the DSM had recruited.  In other words, on these sales, the RSM would

---

[1] On May 3, 2012, the court granted in part and denied in part the Motion to Withdraw as
Counsel for Plaintiff filed by Charles L. Richardson, David R. Keesling, Heidi L. Shadid and
Melissa, A. East, attorneys for plaintiffs. [Dkt. ##108, 114].  The motion was granted with
respect to Roberts and denied with respect to CEC.  Both CEC, through counsel, and Roberts,
acting *pro se*, have filed responses to the Motion for Summary Judgment [Dkt. ##114, 118].  The
responses are largely identical.

either pay to the DSM all or a percentage of the override he would have otherwise been entitled to receive from AMS.  [Dkt. #102, Ex. 6, Terrian Dec., ¶6].

Additionally, the AMS sales hierarchy also included independent insurance agents who sold AMS insurance products to individuals or small groups.  The independent agents usually had contracts with several different insurance companies, and were paid a commission directly by AMS when they sold its products.  [*Id.,* ¶7].  All RSMs and DSMs were required to have an agent appointment with AMS.  [*Id.,* ¶9].

With the approval of the DSM, an agent could also sign an addendum to his agent contract to become a General Agent.  The General Agent earned compensation by receiving (1) overrides from the sale of AMS insurance products by independent agents he recruited and/or (2) additional commissions form his own personal sale of AMS insurance products.  [*Id.,* ¶8].

In 1989, Roberts owned and operated CEC, an independent insurance agency that primarily marketed life insurance and annuities for various carriers.  [Dkt. #102, Ex. 3, 12/29/10 Dep of Clay T. Roberts, 11:1-8; Ex. 1, Michael Stephens Dep., 24:16-19].  Roberts and/or CEC had contracts with different insurance companies which allowed them to receive overrides on products sold by independent agents in their territory.  [*Id.,* Ex. 1, Stephens Dep.,  9:7-25].

Stephens, who specialized in selling and marketing employee benefit products (including medical insurance), approached Roberts about working at CEC.  [*Id.,* Ex. 1, Stephens Dep., 262:5-13].  Initially, there was no formal employment arrangement between Stephens and Roberts, but during 1990, Stephens and Roberts entered into an independent contractor arrangement, where Stephens served as a "brokerage manager" for CEC.   [*Id.,* Ex. 2, Dep. of Roberts Dep., 54:13-19; Ex. 3, Roberts Dep., 61:2-11; Ex. 1, Stephens Dep., 7:6-18].  Stephens' primary job duty was to recruit insurance agents to sell insurance products offered by CEC.  [*Id.,*

Ex. 1, Stephens Dep., 22:11-23:13]. Roberts originally paid Stephens a percentage of the overrides CEC received, but subsequently changed Stephens' compensation to a monthly salary and company car. [*Id.,* Ex. 1, Stephens Dep., 9:7-11; 10:1-5; 12:5-10]. Stephens' employment relationship with CEC was "at will," and there was no covenant or agreement not to compete. [*Id.,* Ex. 3, Roberts Dep., 60:17-61:11].

Dale was an RSM for AMS. In November 1989, Dale and AMS executed an RSM contract which provided, inter alia, that Dale was an independent contractor who was entitled to earn overrides from the sale of AMS insurance products sold by independent agents in his territory (Texas and Oklahoma) and under his hierarchy. [*Id.,* Ex. 5, Martin Dale Dep., 16:12-17:9; 40:16-41:3; Ex. 6, Terrian Dec., ¶10].

Some DSMs in Dale's hierarchy were salaried employees who focused primarily on recruiting independent insurance agents to sell AMS insurance products to their clients and operating a physical sales office that provided premium quotes for products. Other DSMs in his organization were independent contractors who were entitled to overrides from compensation Dale received from AMS. [*Id.,* Ex. 1, Stephens Dep., 39:14-40:13; Ex. 5, Dale Dep., 68:19-70:9; 103:20-104:3; 138:11-139:12]. Significantly, regardless of whether the DSM was salaried or commissioned, AMS had no contractual obligation to pay the DSMs' compensation. Rather, AMS had a contractual obligation to pay Dale overrides on AMS products sold in his territory, and Dale, in turn, had separate agreements to pay his DSMs to assist him in marketing AMS products. [*Id.,* Ex. 5, Dale Dep., 77:21-79:1; 138:11-139:12].

During 1991, Dale met with Stephens and Roberts to discuss AMS. Stephens' business focus was health insurance, and he wanted to sell AMS products. Dale and Stephens testified that Roberts' focus was life insurance and annuities; he had minimal interest in health insurance

but had no objection to adding AMS to the line of insurance products Stephens made to his independent agents.  [*Id.,* Ex. 5, Dale Dep., 20:24-21:18; 50:25-51:13; Ex. 1, Stephens Dep., 21:22-23:13].  Accordingly, both Roberts and Stephens signed agent contracts with AMS, and Roberts, as president of Life Insurance Counselors Agency, Inc. ("LICA"), also signed an Addendum to Agent Contract for General Agent which permitted LICA to recruit agents on behalf of AMS.  [*Id.,* Ex. 2, Roberts Dep., 22:13-16; Ex. 3, Roberts Dep., 8:7-11; Ex. 3, Roberts Dep., Exs. 2A and 3 thereto; Ex. 6, Terrian Decl, ¶¶13, 14 and Exs. 1, 2 thereto].  On October 10, 1991, CEC submitted an Application for Agent Appointment signed by Roberts.  [Dkt. #116, Ex. D].  On November 8, 1991, an Agent Contract between CEC and AMS was executed.  [*Id.,* Ex. E].

Stephens did well marketing AMS products, and Dale approached him about becoming a commissioned district sales manager.  [*Id.,* Ex. 5, Dale Dep., 45:5-47:8].  Athough Roberts did not personally market AMS products or develop the network of independent agents that sold the products, Stephens told Dale that Roberts preferred to sign these types of contracts.  [*Id.,* Ex. 1, Stephens Dep., 61:25-634:7; 274:20-275:1; Ex. 5, dale Dep., 45:21-46:7].  Dale had no objection, so long as Stephens was the person actually doing the work.  [*Id.*, Ex. 5, Dale Dep., 45:5-20].

As a result, on April 9, 1992, Roberts signed his first district sales manager contract (the "April 1992 DSM Contract").  [*Id.,* Ex. 6, Terrian Dec., ¶13 and Ex. 3 thereto].  The contract provided, *inter alia*, that Roberts was an independent contractor whose primary duties were to recruit, train, motivate and retain "producers" in eastern Oklahoma.  [*Id.,* Ex. 3 to Terrian Dec.; Ex. 2, Roberts Dep., 58:17-59:1].  On October 1, 1992, Roberts executed his second district sales manager contract (the "October 1992 DSM Contract"), which superseded the first contract.  [*Id.,*

Ex. 6, Terrian Dec., ¶13 and Ex. 4 thereto, § VIII.A; Ex. 2, Roberts Dep., 58:17-59:1].  Under the

new contract, the job duties remained the same, although the contract added a covenant not to

compete and specified the sales territory as Tulsa.  On December 1, 1992, Roberts executed his

final district sales manager contract (the "December 1992 DSM Contract"), which superseded

his October 1, 1992, contract.  [*Id.,* Ex. 6, Terrian Dec., ¶13 and Ex. 5 thereto, § 13; Ex. 2,

Roberts Dep., 61:18-21].  The December 1992 DSM Contract included the following provisions:

- An acknowledgement that Roberts had an agreement with Dale to be a district sales manager (the "RSM/DSM Agreement"); Dale (not AMS) was responsible for Roberts' compensation as a DSM; and AMS could—with Dale's authorization—directly pay portions of the overrides AMS owed Dale directly to Roberts.

- The contract would "simultaneously" terminate when the RSM/DSM Agreement between Dale and Roberts terminated.

- Like earlier versions, the contract was to be governed by the laws of Wisconsin.

[*Id.,* December 1992 DSM Contract, Ex. 5 to Terrian Dec.].[2]

From 1992 to late 1995, Stephens performed the actual duties of the district sales

manager; Roberts had no direct involvement with developing agents in the field for AMS

insurance.  [*Id.,* Ex. 1, Stephens Dep., 274:20-275:1].

During 1995, the individuals who owned AMS decided to sell the company.  [*Id.,* Ex. 5,

Dale Dep., 11:22-12:15].  As a result, Dale announced his intent to end his affiliation with AMS

and terminate his regional sales manager contract effective December 31, 1995.  [*Id.,* 25:9-17;

30:18-32:3].  AMS asked Dale to identify candidates to replace him as Regional Sales Manager.

[*Id.,* 18:20-19:1].

---

[2] The April 1992 DSM Agreement, the October 1992 DSM Agreement and the December 1992 DSM Agreement, all reflect that Roberts—and not CEC—was the district sales manager.  None of the agreements specify CEC or *any* other person or entity as the "district sales office." Likewise, Roberts testified CEC was *not* the district sales manager or "office" under the October 1992 DSM contract.  [*Id.,* Ex. 2, Roberts Dep., 68:2-10].

Dale met with Stephens and let him know he thought Stephens would be a good choice for the position. [*Id.,*70:18-71:5; 87:10-23]. Dale did not think Roberts should be a regional sales manager primarily because (1) AMS needed someone who would be exclusively devoted to AMS, and Roberts had not (and would not) be exclusive to any single insurance company, (2) Stephens, and not Roberts, was the person that actually performed the duties of district sales manager and developed relationships with the independent agents, and (3) Roberts did not have the necessary experience. [*Id.,* 18:20-20:6; 75:11-77:16; Ex. 1, Stephens Dep., 59:12-19; 238:8-239:6].

Stephens once again advised Dale that Roberts usually signed contracts with insurance companies and that he would have to discuss the matter with him. [*Id.,* Ex. 1, Stephens Dep.,62:23-64:7; Ex. 5, Dale Dep., 70:18-71:5]. Dale told Stephens he understood and did not care what arrangement Roberts and Stephens made between themselves as to how the overrides under the new contract would be handled. [*Id.,* ex. 5, Dale Dep., 53:14-55:9; 71:17-73:1; Ex. 1, Stephens Dep., 65:6-22]. However, he also told Stephens he would not recommend that Roberts be offered the regional sales manager contract and, if Stephens would not accept it, he had other candidates in mind. [*Id.,* Ex. 1, Stephens Dep., 70:2-23; Ex. 5, Dale Dep., 18:20-20:6; 70:10-71:1]. Despite his claims in this lawsuit, Roberts has conceded AMS had no obligation to offer him the regional sales manager contract. [*Id.,* Ex. 3, Roberts Dep., 187:18-21].

Stephens met with Roberts and discussed the Regional Sales Manager contract. Roberts was only "reluctantly agreeable" to Stephens becoming RSM for AMS because "[h]e always wanted to have contracts in his name" so he would have "control of them." [*Id.,* Ex. 1, Stephens Dep., 70:2-71:13]. Stephens told Roberts that if Stephens did not take the regional sales manager contract, Dale would replace him with other people in his office. [*Id.,* 70:7-11]. He told Roberts

he was willing to assign overrides he earned under the regional sales manager contract to CEC if Roberts would enter into a written agreement with him setting forth the terms of their employment relationship and how Stephens would be compensated in the future.  [*Id.,* 70:2-71:2; 73:13-17; 74:1-16; 75:13-15; 83:10-23; 89:2-10]. According to Stephens, the two did not discuss what type of commission/override assignment would be made.  [*Id.,* 73:13-17; 75:13-15; 89:2-10].  Roberts has conceded that at this point, Stephens could have simply quit working for him and opened up an office as an AMS regional sales manager.  [*Id.,* Ex. 3, Roberts Dep., 189:5-8; 189:16-20].

On February 26, 1996, Stephens executed the Regional Sales Manager Contract (the "Stephens' RSM Contract").  (*Id.,* Ex. 1, Stephens Dep., 75:16-20; 200:2-201:2; Ex. 6, Terrian Dec., ¶17 and Ex. 7 thereto].  Roberts testified he knew the contract was between AMS and Stephens; he and Stephens, in turn, had an agreement that Stephens would assign the commissions earned under the RSM contract to CEC.  [*Id.,* Ex. 3, Roberts Dep., 83:1-4, 83:16-19]. He testified he knew Stephens executed the agreement and did not object in light of his understanding with Stephens.  [*Id.,* Ex. 3, Roberts Dep., 83:12-84:4; 98:16-99:5; Ex. 1, Stephens Dep., 236:24-237:12; Ex. 5, Dale Dep., 105:23-107:22].  Stephens' RSM Contract became effective on April 1, 1996.  [*Id.,* Ex. 6, Terrian Dec., ¶17 and Ex. 7 thereto].

Dale terminated his regional sales manager contract with AMS effective April 1, 1996. [*Id.,* Ex. 5, Dale Dep., 65:10-16; Ex. 6, Terrian Dec., ¶11].  After terminating his regional sales manager contract, Dale agreed to serve as a Regional Vice President of AMS until January 31, 1997. [*Id.,* Ex. 5, Dale Dep., 12:14-15; 28:23-30:4; 79:2-7].  The termination of Dale's regional sales manager contract caused termination of Dale's agreements with his district sales managers, including Roberts' December 1992 DSM Contract, effective April 1996.  [*Id.,* Ex. 3, Roberts

8

Dep., 130:10-131:18 and Ex. 31 thereto; Ex. 1, Stephens Dep., 253:13-236:13; Ex. 5, Dale Dep., 7:2-6; 105:23-106:4]. Although he was not contractually obligated to do so, Dale authorized AMS to pay Roberts the five years of vesting payments that were set forth in the December 1992 DSM Contract. [*Id.,* Ex. 6, Terrian Dec., ¶16]. Thus, from April 1996 to April 2001, Roberts received a full five years of vesting payments as a result of the termination of the December 1992 DSM Contract. [*Id.*].

Stephens became one of the new AMS Regional Sales Managers effective April 1, 1996, and Roberts, individually, executed a new general agent addendum and super general agent ("SGA") contract, both reflecting the Stephens was his new Regional Sales Manager. [*Id.,* Ex. 3, Roberts Dep., 100:23-101:4; 101:25-102:3; 102:22-103:14 and Exs 19, 20 thereto; Ex. 1, Stephens Dep., 244:23-248:1; Ex. 6, Terrien Dec., ¶¶18, 19 and Exs. 8, 9 thereto]. These contracts allowed Roberts to receive additional overrides on any agents who Roberts recruited to be in his sales hierarchy. [*Id.,* Ex. 1, Stephens Dep., 246:13-148:1].

On or about April 22, 1996, Roberts approached Stephens with an "Agent Assignment of Commissions" form (the "First Assignment"), and demanded that Stephens sign it. [*Id.,* Ex. 1, Stephens Dep., 85:24-86:3; 87:13-19 and Ex. 5 thereto]. The First Assignment provided that all first year and renewal commissions earned by Stephens from April 1, 1996 and thereafter were assigned to CEC. [*Id.*]. Additionally, the form provided two options for revocation:

> Future revocation of this Assignment of Commission should be handled in the following manner:
>
> [1] This assignment will continue in force until revoked in writing by me [Stephens] and accepted by assignee [CEC], except that no acceptance by the assignee is required if I revoke this assignment only as to commissions on business issued after the date of revocation [or]
>
> [2] This assignment will continue in force until revoked in writing by me.

[*Id.,* Stephens Dep. 188:9-22 and Ex. 5 thereto].  Roberts had already checked the first option.

[*Id.,* Stephens Dep., 85:24-86:3].  Stephens executed the assignment form and sent it to AMS.

[*Id.,* Stephens Dep., 88:11-18].  AMS received the first Assignment on or about May 1, 1996.

[*Id.,* Ex. 5 to Stephens Dep.].

Soon after executing the First Assignment, Stephens had second thoughts.  He did not

trust Roberts and was concerned that Roberts had still not prepared a written agreement

formalizing their employment relationship.  [*Id.,* Ex. 1, Stephens Dep., 115:7-21; 147:25-148:7;

152:17-153:4].  As a result, on or about May 8, 1996, Stephens decided to submit another

assignment changing the revocation provision (the "Second Assignment").  [*Id.,* Ex. 1, Stephens

Dep., 191:23-192:6 and Ex. 4 thereto].  Stephens called Nikole Mocco at AMS and asked her if

the First Assignment was in effect.  [*Id.,* 190:16-24].  Mocco looked around and found the

assignment but said she "had not done it."  [*Id.,* 190:25-191:2].  Stephens told her he was

sending her a new assignment.  [*Id.,* 191:2-3].  She asked him, "Well, which one do you want me

to do?" and he told her, "Do the one I'm faxing to you."  [*Id.,* 191:3-6].  Mocco said, "I will

accept the faxed one and send me the original to follow." [*Id.,* 191:6-7].

Plaintiffs, relying on a one-page document titled "RESPONSE FROM MIKE TO 1/9/97

LETTER," [Dkt. #116, Ex. O], assert that defendants encouraged Stephens to submit the Second

Assignment.[3]  The last paragraph of the document contains the following statement:

> The recension [*sic*] of the assignment was done immediately.  Clay came to me
> [Stephens] on  March 22, 1996 and had me sign an irrevocable assignment of
> commissions.  I spent the next week with AMS middle and upper management.  Several
> of them made it a point to approach me in regards to the Tulsa situation.  Each informed
> me that while they would let us try our current arrangement, that they might require us to
> totally separate the Tulsa RSO and the CEC office.  They also told me that I should
> not have an irrevocable assignment to Clay and CEC.  Upon my return to Tulsa, I

_____

[3] Defendants have moved to strike the document on the grounds that it is unauthenticated and
inadmissible. [Dkt. #129].

immediately filed a new one.  Both were registered on April 8, 1996 with my instructions to replace the irrevocable one with the one revocable only by me.

[*Id.*].  During his deposition, Stephens was shown the document.  He testified:

> Q:  So no one intimated to you that you should not do an irrevocable assignment to Clay?
>
> A:  Nobody said that directly.
>
> Q:  Well, what did they say—
>
> Q:  You can present two or three situations and each time they will tell you this. So if you make it part of a statement, it comes across sounding like that.  That's why I don't think I put that down there.
>
> Q:  Did they say that indirectly you should not have an irrevocable assignment to Clay?
>
> A:  No.

[Dkt. #103-1, Ex. 1, Stephens Dep., 113:11-22].  Stephens testified that neither Dale nor anyone at AMS influenced his decision to submit the Second Assignment.  [*Id.,* 240:13-19; 242:4-13; 92:25-93:23].

Stephens testified that from April 1996 to November 1996, he and Roberts became increasingly distrustful of each other.  [*Id.,* Ex. 1, Stephens Dep., 114:10-13; 115:7-21; 136:13-16].  Dale testified he was aware based on his communications with Roberts that the relationship between the two had deteriorated.  [*Id.,* Ex. 5, Dale Dep., 97:12-22].

Stephens ultimately decided to leave CEC and operate his own office.  [*Id.,* Ex. 1, Stephens Dep., 197:1-4].  On November 12, 1996, he revoked the Second Assignment and terminated his employment at CEC.  [*Id.,* Stephens Dep., 243:14-21].  Stephens testified that neither Dale nor anyone at AMS influenced or participated in his decisions to revoke the Second Assignment and/or terminate his employment at CEC.  [*Id.,* Stephens Dep., 243:22-244:7; 253:8-254:3].

After Stephens terminated his employment at CEC, Roberts learned for the first time Stephens had submitted the Second Assignment.  [*Id.,* Ex. 3, Roberts Dep., 83:12-84:4; Ex. 1, Stephens Dep., 192:7-22].  Thereafter, Stephens and Roberts disputed who was entitled to the overrides generated from the Stephens RSM Contract.  [*Id.,* Ex. 3, Roberts Dep., 83:12-84:4].

As a result of the dispute, on June 12, 1997, AMS filed an interpleader action in Tulsa County District Court regarding overrides due under the Stephens RSM Contract (the "Interpleader Suit").[4] [*Id.,* Ex. 6, Terrien Dec., ¶24 and Ex. 12 thereto].  Pursuant to the state court's orders, AMS deposited the disputed overrides into a bank account (the "Interpleader Bank Account"), and continued to deposit the disputed overrides into the Interpleader Bank Account on a monthly basis.  [*Id.,* Ex. 6, Terrien Dec., ¶24 and Ex. 13 thereto].

On November 10, 1998, the state court discharged AMS from the Interpleader Suit as follows:

> AMS shall be discharged from this interpleader action and from any liability as to the claims arising out of the interpled funds reserving all other claims of the parties against each other.

[*Id.*].  Although AMS was discharged from the Interpleader Suit, it continued, under the terms of the discharge order, to make the required monthly deposits into the Interpleader Bank Account.  [*Id.*].

In 1997, AMS began changing the sales hierarchy it used to sell its products.  All RSMs were converted from independent contractors earning overrides to salaried employees.  [*Id.,* Ex. 1, Stephens Dep., 154:2-17; 186:14-187:1; Ex. 5, Dale Dep. 125:23-126:4; Ex. 6, Terrien Dec., ¶23].  As a result, Stephens' RSM Contract was terminated effective May 2, 1997, and Stephens became an employee of AMS effective May 5, 1997, when he executed an employment contract.

---

[4] The Interpleader Suit was styled as *American Medical Security, Inc. v. Clay T. Roberts, Michael R. Stephens, and Charitable Estate Counselors, Inc.,* No. CJ-97-2909, Tulsa County District Court.

[*Id.*, Ex. 1, Stephens Dep., 20:5-7; Ex. 6, Terrien Dec., ¶¶22, 23 and Ex. 11 thereto].  Pursuant to the terms of the Stephens RSM Contract, Stephens was entitled to three years of vesting payments following termination of the contract.  [*Id.,* Terrien Dec., ¶25].  All of the vesting payments were deposited into the Interpleader Bank Account.  [*Id.*].  As set forth in defendants' summary judgment evidence, because of a clerical error, AMS actually paid more into the Interpleader Bank Account than was actually due under the Stephens RSM Contract.  [*Id.,* Ex. 6, Terrien Dec., ¶26].

On August 18, 2000, Roberts and Stephens settled their dispute regarding overrides due under the Stephens RSM Contract.  [*Id.,* Ex. 3, Roberts Dep., 201:2-11 and Ex. 38 thereto].  However, the Interpleader Suit was not actually dismissed until June 30, 2005.  [*Id.,* Ex. 6, Terrien Dec., ¶28 and Ex. 15 thereto].  At the time Stephens and Roberts finally withdrew the disputed funds from the Interpleader Bank Account, no more overrides were owed under the Stephens RSM Contract.  [*Id.,* Ex. 4, 03/30/06 Dep. of Clay T. Roberts, 65:20-66:13; 69:3-71:15; Ex. 6].  In summary, AMS deposited a total sum of $215,358.99 into the Interpleader Bank Account.  [*Id.,* Ex. 6, Terrien Dec., ¶27 and Ex. 14 thereto].  Of those funds, Stephens received $25,000 to pay his attorneys and Roberts received the balance.  [*Id.,* Ex. 4, Roberts Dep., 59:17-60:14; Ex. 1, Stephens Dep., 249:21-250:7].

By letter dated June 12, 1998, Roberts requested that he be removed from Stephens' sales hierarchy and placed with Larry Pond ("Pond"), who was a general agent.  [*Id.,* Ex. 6, Terrien Dec., ¶29].  AMS takes the position that based on Roberts' request and transition to Pond, his Addendum to Agent Contract for General Agent and SGA contract with Stephens terminated on June 12, 1998.  [*Id.*].  Roberts asserts that the request did *not* result in termination of the two

agreements because written notice of termination was required.  [Dkt. #116 at 11, ¶16].[5]

Roberts testified that effective March 29, 1999, his agent contract with AMS terminated. [Dkt. #102, Ex. 3, Roberts Dep., 133:20-134:7 and Ex. 33 thereto].  Amy Terrien, a longtime employee and most recently, Supervisor of Licensing and Commissions for AMS, testified based on her review of AMS records, that all commissions and/or overrides owed to plaintiffs under the district sales manager contract, general agent addendum, super general agent contract and agent contract have been paid to plaintiffs.  [*Id.,* Ex. 6, Terrien Dec., ¶¶ 16, 31].

Roberts testified he believes his commissions "were modified, reduced and eventually terminated."  [Dkt. #116, Ex. C, Roberts Dep., 144:3-11].  He further testified the December 1992 agreement "was impacted through the two prior contracts as well, which would be April of 1992 and October of 1992 as well as the one with Marty Dale in December of 1992."  [*Id.,* 157:8-16].  Plaintiffs further contend neither  the CEC contract nor the LICA contract were ever terminated.  [Dkt. #116 at 8, and Ex. S., Jerry Garrett Dep., 53:10-15].

Plaintiffs assert, "Pursuant to conversations with AMS's legal counsel, Roberts confirmed that AMS took overt actions that resulted in certain overrides not being paid pursuant to Plaintiff's Agent Contract with AMS."  [Dkt. #116 at 8, Statement of Additional Undisputed Material Fact #22].  However, the deposition testimony cited does not support this statement. [*Id.,* Ex. C, Roberts Dep. 150:7-24]. Rather, in the cited testimony, Roberts appeared to explain the basis for his belief that defendants have beached his contracts.  [*Id.*].

## II. Standard of Review

---

[5] The Addendum to Agent Contract for General Agent provided either party could terminate the contract without cause upon 30 days written notice. [Dkt. #102, Ex. 3, Roberts Dep., Ex. 19 thereto].  The SGA had no provisions regarding termination.  [Dkt. #102, Ex. 3, Roberts Dep., Ex. 20].

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden to show that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1984).

The non-moving party must set forth facts sufficient to establish the existence of a genuine issue for trial. *Rocky Mountain Rogues, Inc. v. Town of Alpine,* 375 Fed. Appx. 887, 891 (10th Cir. 2010). Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The mere existence of "a scintilla of evidence" in support of the non-moving party's position is insufficient. *Id.* To survive a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322. The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury." *Aramburu v. Boeing Co.,* 112 F.3d 1398, 1402 (10th Cir. 1997) (quoting *Williams v. Rice,* 983 F.2d 177, 179 (10th Cir. 1993)).

### III. Analysis

### A. Breach of Contract Claim

To establish a claim for breach of contract, plaintiffs must present evidence of (1) a contract (duty); (2) breach of that contract; and (3) damages flowing reasonably from that breach. *Northwestern*

*Motor Car, Inc. v. Pope,* 187 N.W.2d 200, 203 (Wisc. 1971).  *See also, Digital Design Group, Inc. v. Information Builders, Inc.,* 24 P.3d 834, 843 (Okla. 2001).[6]

### 1. Stephens' RSM Contract

To the extent plaintiffs' breach of contract claim is based on the Stephens RSM Contract, the claim fails for several reasons.  First, as Roberts conceded in his deposition, neither he nor CEC was a party to the contract.  Second, defendants have submitted uncontroverted evidence that AMC deposited all overrides that had accumulated under the contract into the Interpleader Bank Account and continued thereafter to make monthly deposits of the overrides that were generated under the contract in the account.  Third, plaintiffs' claim regarding the Stephens RSM Contract is barred by the doctrine of *res judicata*, as the money due under the contract was the subject of the Interpleader Suit, and the state court entered an order fully discharging AMS from "any liability arising out of the interpled fund." [7]

### 2. Roberts' DSM Contracts

Plaintiffs do not dispute that Roberts' April 1992 DSM Contract was superseded by the October 1992 DSM Contract.  Further, it is undisputed the December 1992 DSM contract terminated when Dale terminated his regional sales manager contract on April 1, 1996.  Plaintiffs, however, assert that (1) the October 1992 DSM Contract was *not* superseded by the December 1992 DSM Contract, but rather survived even after the December 1992 DSM Contract

---

[6] As previously noted, the DSM Contracts are governed by Wisconsin law.  However, the essential elements for breach of contract are the same in Oklahoma.

[7] Under Oklahoma law, the elements of *res judicata* are "1) an identity of subject matter, of the parties or their privies, of the capacity of the parties and the cause of action; 2) the court which heard the original action must have been one of competent jurisdiction; and 3) the judgment rendered must have been a judgment on the merits of the case and not upon purely technical grounds." *Carris v. John R. Thomas & Assocs.,* 896 P.2d 522, 527 (Okla. 1995). *See also, B.J.G. v. Rockwell Automation, Inc.,* No. 11-CV-262-GKF, 2012 U.S. Dist. LEXIS 1620, at *9 (N.D. Okla. Jan. 5, 2012).

was terminated;  and (2) CEC served as the District Sales Office for the District Sales Manager, Roberts.  The language of the DSM Contracts belies these assertions. Section 13 of the December 1992  DSM Contract provides, "This Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and all prior agreements whether written or oral are hereby superseded."  [Ex. 6, Terrian Dec., ¶13 and Ex. 5 thereto, § 13].  Further, both the October 1992 DSM Contract and the December 1992 DSM Contract are between Roberts and AMS.  CEC is not a party, nor is it even mentioned in the contracts. [*Id.,* Ex. 4, 5 to Terrien Dec.].  Additionally, pre-lawsuit correspondence indicates Roberts believed the DSM contract had been terminated.[8]

Finally, even if the October 1992 DSM Contract was a separate agreement which was not terminated, plaintiffs have failed to prove any breach of the contract.  Defendants have presented evidence that Roberts received five years of vesting payments after the DSM contracts terminated.  Although plaintiffs contend they failed to receive all commissions owed pursuant to the DSM contracts, they have come forward with *no* evidence any amounts due to them were unpaid.  Plaintiffs' unsupported conclusory allegation of unpaid commissions does not create a genuine issue of fact about whether they are entitled to damages.  *See L&M Enters. v. BEI Sensors Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000) (mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact).

### 3. CEC's Agent Contract

Citing testimony of Jerry Garrett, Plaintiffs contend CEC's  1991 Agent Contract was never revoked, and they allege AMS took overt actions that resulted in certain overrides not

---

[8]Roberts signed a July 31, 1996 letter to AMS as "former DSO" [Dkt. #102, Ex. 3, Roberts Dep., 111:17-112-22 and Ex. 24 thereto].  In an April 7, 1997, letter to AMS, Roberts states, "My District Sales Manager's contract was terminated in favor of a Regional Sales Manager's contract claimed by Michael P. Stephens."  [*Id.,* 130:10-131:17 and Ex. 31 thereto].

being paid pursuant to the contract.  [Dkt. #116 at 8, Statement of Fact #22 and Ex. E].  However Garrett, a friend of Roberts who worked part time for him in the late 1990's, testified he has no personal knowledge of any of the contracts at issue in this suit, and his "understanding" that the "Contracts" have not been terminated was based solely on what Roberts had told him and on his review of documents Roberts gave him.  [Dkt. #118, Garrett Dep., 42:6-14; 53:10-12; 54:24-55:10; 70:19-71:1].[9]  Thus, Garrett's testimony is not persuasive and does not raise a genuine issue of material fact.  However, even assuming the CEC 1991 Agent Contract was never revoked, the record is devoid of evidence of *any* sale of an AMS policy by CEC, much less any failure by defendants to compensate CEC for sales.

### 3. LICA General Agent Addendum

Plaintiffs assert the February 4, 1991 Addendum to Agent Contract for General Agent, executed by Roberts on behalf of LICA was never terminated and has been breached.  [Dkt. #116 at 15-16].  However, LICA is not a party to the lawsuit, plaintiffs have never before asserted LICA has a claim for commissions,  and although CEC claims in its Response that LICA assigned its commissions to CEC [Dkt. #116 at 16], the record is devoid of any such assignment. More importantly, plaintiffs have not identified a single AMS policy which was sold entitled LICA—or plaintiffs—to an override it did not receive.[10]

Defendants are entitled to summary judgment on plaintiffs' breach of contract claim.

---

[9] Defendants' Motion to Strike [Dkt. #129] seeks exclusion of, *inter alia,* the Garrett testimony. The motion, which was filed May 29, 2012, is not yet at issue.  Therefore, for purposes of summary judgment, the court has considered the Garrett testimony.

[10] Roberts claimed in his deposition that commissions owed to CEC as assignee were either reduced and/or transferred to Dale as RSM, or transferred/diverted to a "dummy account."  [Dkt. #116, Statement of Fact #21 and Ex. C, Roberts Dep., 148:10-20; 176:6-178:11, 182:20-20, 183:3-19].

### B. Interference with Prospective Economic Advantage[11]

The elements of a claim for interference with prospective economic advantage are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted. *Boyle Services, Inc. v. Dewberry Design Group, Inc.,* 24 P.3d 878, 880 (Okla. App. 2001). "Interference includes inducing a third person not to enter into the prospective relation or preventing the other party from acquiring the prospective relation." *Id.* (citing *Brock v. Thompson,* 948 P.2d 279, 293, n. 58 (Okla. 1997). The alleged interference must be intentional and involve some unlawful, malicious or improper conduct. *See, e.g., Miller v. Hospital Care Consultants, Inc.,* No. CIV-10-471-RAW, 2011 U.S. Dist. LEXIS 122055, at *5 (E.D. Okla. 2011) (for tortious interference with prospective economic advantage, plaintiff must show some intentional or improper conduct on the part of defendant); *Dahsan v. The Board of Regents of the University of Oklahoma,* No. 08-CV-370-TCK, 2008 U.S. Dist. LEXIS 92262, at *29 n. 8 (tortious interference with prospective economic advantage requires malice on part of defendant); *Overbeck v. Quaker Life Ins. Co.,* 757 P.2d 846, 848 (Okla. App. 1984) (interference must be improper or malicious).

Relying on the language from the "RESPONSE FROM MIKE TO 1/9/97 LETTER" [Dkt. #116, Ex. O], plaintiffs contend that defendants took active steps to interfere with and induce Stephens to submit the second assignment. [Dkt. #116 at 19].[12]

---

[11]Plaintiffs previously dismissed their claims for interference with "economic, contractual and business relationships." [Dkt. #79].

[12] Defendants' Motion to Strike [Dkt. #129] also seeks to exclude Exhibit O. As previously noted, the Motion to Strike is not yet at issue. Therefore, for purposes of summary judgment, the court has considered the document.

However, the referenced language in the RESPONSE FROM MIKE document does not establish the requisite malicious or otherwise improper intent on the part of AMS. The notes establish nothing more than that AMS employees advised Stephens about the wisdom of signing an irrevocable assignment.  Stephens testified *he* made and carried out the decision to execute a revocable assignment, faxed it to AMS, called Nicole Mocco and instructed her to replace the original assignment with the revocable assignment.

Plaintiffs argue the requisite improper intent or malice can be inferred from Roberts' testimony about his belief that commissions and overrides were diverted from him.  However, absent evidence to back them up, Roberts' bare allegations are insufficient to establish intent. *L&M Enters,* 321 F.3d at 1287.

Defendants are entitled to summary judgment on plaintiffs' claim for interference with prospective economic advantage.

### C. Tortious Breach of Contract

Plaintiffs assert a claim for tortious breach of contract.  A claim for tortious breach of contract requires a "special relationship" which gives rise to a fiduciary duty on the part of the defendant, such as an insurer/insured relationship.  *See, e.g., KT Specialty Dist., LLC v. Xlibris Corp.,* No. 08-CV-249-CVE, 2008 U.S. Dist. LEXIS 68849, at *10-11 (N.D. Okla. Sept. 11, 2008); *Morrison v. Anadarko Petroleum Corp.,* CIV-10-135-M, 2010 U.S. Dist. LEXIS 67077, at *9-10 (W.D. Okla. July 6, 2010).  Under Oklahoma law, parties to arms-length commercial transactions do not owe each other fiduciary duties.  *KT Specialty,* 2008 U.S. Dist. LEXIS 68849, at *11.

Plaintiffs contend a fiduciary duty arises from the agent contracts they executed with AMS. [Dkt. #116 at 20-21; Dkt. #118 at 19].  They contend they "imposed a signfica[nt] amount

of trust and confidence in AMS to pay [them] the appropriate amount of commissions" and their agent contract "was much more than an 'arms length commercial transaction.'" [*Id.*].

The Tenth Circuit rejected this argument in *Dodd Ins. Services, Inc. v. Royal Ins. Co.,* 935 F.2d 1152 (10th Cir. 1991).  There, plaintiffs ran an independently owned insurance agency and sold insurance policies for Royal Insurance Company of America.  *Id.* at 1154.  When Royal attempted to terminate the agreement, plaintiffs filed suit alleging 10 causes of action, including breach of fiduciary duty.  *Id.*  Plaintiffs alleged that over the course of their business relationship, plaintiffs "came to repose trust and confidence in Royal."  *Id.* at 1156.  The court rejected plaintiffs' claim of a fiduciary relationship, noting plaintiffs did not undertake to act for the benefit of Royal, nor was the business relationship between the parties of a nature to "cause plaintiffs to relax the care and vigilance [they] would and *should* have ordinarily exercised in dealing with a stranger." *Id.*  The court concluded the parties had a "strictly contractual relationship."  *Id.* at 1157.

Here, as in *Dodd Ins.,* plaintiffs have presented no evidence of any relationship other than a strictly contractual one.  Defendants are entitled to summary judgment on plaintiffs' claim for tortious breach of contract.

### D. Conversion and Misappropriation

Plaintiffs have asserted claims for conversion and "misappropriation."  The parties have not identified—nor is the court aware of—any common law claim for "misappropriation." Under Oklahoma law, "conversion is any act of dominion wrongfully exerted over another's *personal property* in denial of or inconsistent with his rights therein." *Welty v. Martinaire of Oklahoma,*

*Inc.,* 867 P.2d 1273, 1275 (Okla. 1994).  "The general rule in Oklahoma is that only *tangible* personal property may be converted," and "conversion does not lie for a debt." *Id.*[13]

Defendants are entitled to summary judgment on plaintiffs' claims for conversion and misappropriation.

## E. Accounting Claim

Plaintiffs' seek an accounting for the "misappropriation" of monies owed to them by defendants. [Dkt. #2-2, Petition, ¶78].[14]  In their prior state court lawsuit, plaintiffs voluntarily dismissed this claim on July 6, 2006 (before dismissal of the prior lawsuit in its entirety).  [Dkt. # 102, Ex. 3, Roberts Dep., 135:13-136:14 and Ex. 35 thereto].  This action was not filed until November 19, 2008.  [Dkt. #2-2].  Because plaintiffs did not refile the claim within the one-year period prescribed by the Oklahoma "savings" statute, 10 O.S. § 100, the statute of limitations on the claim has expired.

Moreover, plaintiffs cannot meet the requirements for an accounting.  A request for an accounting or an "equitable accounting" is a "proceeding to adjust mutual accounts and strike a balance."  *See Whitehorse v. Johnson,* 156 P.3d 41, 45 (Oklahoma 2007) (citations omitted). Under both Oklahoma and Wisconsin law, plaintiffs must prove:  (1) a confidential or fiduciary relationship; (2) the defendant had control over another's property and records concerning the property; (3) after a demand for an accounting, defendant did not account for or return the property; and (4) there is no adequate remedy at law. *Howell Petroleum Corp. v. Leben Oil Corp.,* 976 F.2d 614, 620 (10th Cir. 1992) (applying Oklahoma law); *RxUSA v. Capital Returns, Inc.,* 2007 U.S. Dist. LEXIS 68223, *35-36 (E.D. Wisc. Sept. 14, 2007).  Additionally, under

---

[13] Plaintiffs, in their response briefs, did not address the motion for summary judgment on their conversion and misappropriation claims.

[14] Plaintiffs did not respond to defendants' motion for summary judgment on the accounting claim.

Oklahoma law, plaintiff must show that a balance is due in order to establish a right to an accounting. *Howell,* 156 P.3d at 45.

Here, plaintiffs have failed to establish either a confidential or fiduciary relationship between the parties or that they have no adequate remedy at law.  Further, they have presented no evidence defendants owe them any money.

Defendants are entitled to summary judgment on plaintiffs' accounting claim.

### IV. Conclusion

For the foregoing reasons, defendants' Motion for Summary Judgment [Dkt. #102] is granted.

ENTERED this 11th day of June, 2012.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT